**UNITED STATES DISTRICT COURT**

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAMELA FOX, ON BEHALF OF HERSELF AND AS NEXT FRIEND TO C.M.R., A MINOR,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF TULARE, LETICIA CASTANEDA, ERICA SOTO, RON CASTANEDA, JULIA LANGLEY, CAROL HELDING, JOHN ROZUM, STEVEN ROGERS and DOES 1-100,<br><br>Defendants. | Case No. 1:11-cv-00520-AWI-SMS<br><br>ORDER RE: MOTION TO STRIKE OR LIMIT ATTORNEY EXPERTS<br><br>(Doc. 96) |

Plaintiffs have identified nine proposed experts. Three of these are attorneys in private practice: Carol M. Langford, Ann Nicholson Haralambie, and Maureen M. Bryan-Furgurson. On August 15, 2013, Defendants Tulare County, Julia Langley, Carol Helding, and John Rozum ("Defendants" or "Tulare Defendants") filed a motion to strike portions of Plaintiffs' expert witness designations or, in the alternative, to limit the number of attorney experts. Doc. 96.

On August 21, 2013, Plaintiffs filed their opposition. Doc. 101. Defendants replied on September 5, 2013. Doc. 107. This Court determined that the motion was suitable for decision without oral argument, and the hearing was taken off calendar and the matter was taken under submission pursuant to Local Rule 230(g).

For the reasons that follow, Defendants' motion is GRANTED. Plaintiffs may proceed with one of the three proposed experts. Plaintiffs may choose this expert; the other two shall be stricken.

1

**SUMMARY OF ALLEGATIONS**

The Court begins by summarizing the facts relied upon by the experts. This summary derives from the experts' reports or from the complaint, and in no way implies that any of these allegations are either true or false.

C.M.R. was born in October 2005. In November 2005 Plaintiff filed a case in Tulare County family court (case no. 05-216719), seeking child support from Defendant Rogers. In September 2007, Fox first sought enforcement of the child support orders through the District Attorney's Child Support Division.

On July 22, 2008, a hard drive was confiscated from Rogers; an affidavit for a search warrant was prepared under investigation case number 08-10615. The results of the search were later sealed. In October 2008 a contempt action was filed against Rogers by the Department of Child Support Services for failure to pay support. Also in October 2008, Rogers filed a motion in family court for custody of C.M.R.

Between 2006 and 2009, the Tulare County Child Welfare Services (CWS) received several reports alleging that Rogers had been sexually abusing C.M.R. CWS concluded that these allegations had been fabricated by Fox. In December 2008, and again in July 2009, CWS consulted County Counsel to discuss whether Fox's behavior was sufficiently harmful to C.M.R. to justify seeking a court order removing C.M.R. from Fox's custody. CWS never decided to remove C.M.R., and did not file any petition to declare her a dependent under Welfare & Institutions Code § 300.

On May 12, 2009, the court considered Rogers's custody motion. The court heard testimony that Fox had been making frivolous allegations of sexual abuse against Rogers. The court ordered joint custody, with Rogers having primary physical custody.

Prior to July 2009, Fox was represented solely by family law attorney James Christenson. In July 2009, Fox retained Seth Goldstein to represent her in the state court custody matter. (Goldstein remains her attorney in this federal action.) Based on additional statements made by C.M.R., Fox now filed her own motion to change custody, while at the same time seeking production of supportive documents from the County. The hearing on the custody motion would ultimately be continued from October 2009, to November 2009, to December 2009, to May 2010, to February

2011. Plaintiffs argue that these continuations were "because of the delays in securing the records and evidence from C.W.S. and the Sheriff." Langford at 31. Indeed, for the remainder of 2009 and 2010—and to a lesser extent from 2011 to the present—the lion's share of allegations in the complaint and in the experts' reports describe efforts by County Counsel to impede Ms. Fox's efforts to obtain documents, whether in juvenile court, family court, or elsewhere. In the words of proposed expert Langford:

> At each juncture when Mr. Goldstein filed subsequent petitions/requests in Juvenile Court or filed motions in the Family Court seeking release of the Child Welfare Services documents, Sherriff's records and evidence taken in the investigations of the abuse reports[,] County Counsel, including Julia Langley and Carol Helding, interfered by filing objections.

Langford at 20. It is these efforts to interfere with Plaintiffs' access to documents in previous litigation that are the main focus of the three attorney expert reports in this case.

## THE ATTORNEY EXPERT REPORTS

Langford is an attorney in California. Plaintiffs characterize her as an ethics expert (opp. at 3, 6), and her report focuses on California Rules of Professional Conduct. Her report begins with a statement of facts which, according to her report, derives from a 100-item list of documents which she reviewed (Langford at 2-34; Appendix) as well as from a number of assumptions. Many of these assumptions are stated in a section which apparently purports to identify all the assumptions relied upon in the report (*see* Langford at 33-34); others are mentioned elsewhere in the report (*see, e.g.,* Langford at 18, 31, 35, 37). Many of these assumptions consist of opinions which Langford believes will be offered by other attorney experts.

Haralambie is a Certified Family Law Specialist in Arizona. Among other sources, she states that her opinion is "based on" the "summary of facts" produced by Langford and Bryan-Furgurson and the assumptions stated by Langford. She also claims that she relied in part upon the opinions of these experts. Bryan-Furgurson is an attorney practicing family law in California. Because the opinions of the latter two experts essentially mirror Langford's, the Court summarizes only Langford's report, pointing out the similarities to other reports parenthetically.

Langford's first opinion is that County Counsel misled the Court. Its behaviors, she explains, would be misleading "to the average person" or comprise a "lie by omission." She adds:

"Assuming [County Counsel] Langley made misrepresentations ... to the Family Court judge ... she misled the court." Langford at 35. She then explains why these misrepresentations were wrong, making reference to provisions of California law which make it improper to mislead a judge. *Id*.[1]

Langford's next opinion is not identified as such; it appears at the end of the section which identifies her first opinion, and it is not separately identified among the "three ways" in which County Counsel violated the California Rules of Professional Responsibility. Langford at 34. Her opinion is that County Counsel Langley "violated her ethical duty of competence" because she did not personally check the content of Mr. Rogers's computer. Langford finds fault with this behavior because "[i]t is a basic duty to review documents that a client provides." Langford at 37. (Although Langford mentions that "other expert witnesses" will also fault County Counsel for this lapse, in fact Langford is the only expert to express an opinion on this failure to review files on the computer.)

Next, Langford opines that County Counsel was unreasonably untimely in reviewing the CWS file, then interposed an "excessive amount" of objections to Ms. Fox's requests for documents. Langford at 37-43; *cf.* Haralambie at 3, 5; Bryan-Furgurson at ¶¶ 32, 44. In Langford's expert opinion, bad faith delays such as these are problematic because California proscribes tactics that are "bad-faith," "frivolous," or without "substantial purpose other than delay;" similar prohibitions appear in the public law treatise that Defendants rely upon. She also cites a California case indicating that County Counsel owed a duty to protect the best interest of C.M.R.[2]

Finally, County Counsel took too long to appoint separate counsel for C.M.R., and failed to appoint counsel for CWS. As a result, its representation of CWS and the Sheriff's Office were in conflict, and it was further conflicted in its obligations to Ms. Fox and C.M.R. *Cf.* Haralambie at 6.

---

[1] Haralambie expresses a similar opinion: "[I]f the County Counsel argued for the agency's objection to disclosure to cover up wrongdoing by the CWS workers, to protect the County from potential tort liability, to protect the father, or to punish a parent who made trouble for the agency, that would not be proper." Haralambie at 5. While both attorney experts describe an ethical rule against misleading judges, Plaintiffs' distinction is that Langford derives the requirement to be honest from substantive California law regulating lawyers; for Haralambie, it is an expression of "the state's *parens patriae* interest" in "ensuring the safety of children." Haralambie at 5, 1. In general, the experts fault County Counsel for the same errors but trace the sanction to different sources.

[2] Haralambie finds the same behaviors problematic, but she relies on this California case, on the *parens patriae* responsibility, on the ABA Standards of Practice for Lawyers Representing Child Welfare Agencies (which is not adopted in California), and on her understanding of the legislative intent of the statute providing limited access to juvenile court records, Welfare and Institutions Code § 827. Haralambie at 3-5.

The basis for Langford's opinions includes several "assumptions." One assumption is that "at least one expert will testify that the degree of resistance on the part of the attorneys in this matter was extreme." Langford at 31, 33-34; *cf.* Haralambie at 3, 5; Bryan-Furgurson at ¶¶ 32, 44. (In fact, Langford does not rely on any other expert for this conclusion but reaches it independently.)[3] A second assumption is that an expert will testify that "often there is little or no evidence to corroborate a child's account of sexual abuse, especially when the child is so young." Langford at 31. (No attorney expert expresses this opinion, so again, it does not suggest a need for including additional expert attorneys.)[4] Apparently a third assumption is that possession of child pornography, combined with allegations of molesting a child, together represent a profile that is highly relevant in determining the risk that a person poses to one's own child. Langford at 31. (Again, no attorney expert expresses this exact opinion.)[5] A fourth assumption is that computer images actually "did play a role" in "whether or not" Mr. Rogers was molesting C.M.R. Langford at 34. (Interpreted liberally, this otherwise nonsensical statement is identical to the third assumption, for which no outside attorney expert opinion is needed.)[6] A fifth assumption is that social work experts will show that the social workers failed to meet their own standards of care. Langford at 31. A sixth assumption is that the lawyers for C.M.R. and Ms. Fox acted competently. Langford at 34. (Neither of these last assumptions draws upon other attorney expert testimony.)

---

[3] In her own opinion, "the facts show" that "County Counsel caused unreasonable delay ... by neglecting to review the CWS file in a timely fashion and by making an excessive amount of objections to Ms. Fox's requests for documents." Langford at 38. More importantly, Langford acknowledges that expert testimony on this point might be entirely unnecessary: the fact that County Counsel's objections "were no longer proper ... seems clear, even without expert opinion." Langford at 42. Bryan-Furgurson, too, agrees that County Counsel's "repeated objections" were "highly unusual and extreme," but she bases this opinion in a different set of norms. She refers to "due process rights," the fact that "a parent who commits child abuse is not acting in the child's best interests," and the legislative intent of Welfare and Institutions Code § 827. Bryan-Furgurson at ¶¶ 24-25, 27. She also refers to "the federal constitutional rights to parent and association." *Id*. Here she is ambiguous whose right to associate she is referring to (e.g., mother's right to associate with daughter, daughter's right to associate with mother, or some other right).

[4] No expert expresses this opinion. The closest opinion is by Haralambie that "disclosures of abuse may be made in bits and pieces over a long period of time," especially when they come from young children. Haralambie at 1. This is different from saying that evidence is often entirely absent. Furthermore, knowledge of family law is not necessary for this opinion; for example, one of Plaintiff's experts in child welfare services, Robert Geffner, Ph.D., opines that "most young children ... disclose at a lower rate than older children." Geffner at 14.

[5] Haralambie's opinion focuses only on possession of child pornography as a risk factor, not on allegations of abuse as a risk factor. Haralambie at 3-4. Each of the child welfare services experts also opines on this subject, with varying degrees of detail. *See* Suter at 3; Lawson at 8, 17; Geffner at 56, 57-58.

[6] This statement is incomprehensible. Having assumed that possession of pornography increases the risk of molestation, the expert cannot say that the presence of pornography can play a role in whether a person was *not* molesting a person. At best, the statement simply repeats the risk factors expressed in the previous footnote.

5

According to Plaintiffs, Langford's opinion that County Counsel engaged in ethical violations relies upon opinions of the other two experts. Opp. at 6. But far from assuming certain expert testimony, Langford seems to assume lay testimony, simply "[a]ssuming Ms. Langley made misrepresentations." Langford at 35. Furthermore, while Plaintiffs state that Langford's expertise is needed to comment upon the fact that the defendant attorneys "acted as witnesses, filing declarations under the penalty of perjury," Langford does not testify to this behavior at all. *See* Langford at 35-37. While Haralambie acknowledges the opinions of other experts and states generally that she relied upon their reports, she does not refer to any specific opinions from other attorney experts. Bryan-Furgurson's report also does not explicitly refer to the other experts' reports.

**DISCUSSION**

Defendants ask the Court to exercise its authority to limit the use of testimony from these three attorney witnesses to "avoid unnecessary proof and cumulative evidence." *See* Fed. R. Civ. P. 16(c)(2)(D); *see also Green Const. Co. v. Kansas Power & Light Co.*, 1 F.3d 1005, 1014 (10th Cir. 1993) ("It is certainly within the district court's discretion to limit the number of experts, provided the witnesses are not excluded arbitrarily, or on the basis of mere numbers."). Defendants complain that these experts "address the same issues, give opinions on the same issues, rely on the same alleged facts and documents, and essentially provide a single opinion masquerading as three separate opinions." Doc. 96 at 4. Their costs and fees to depose all three experts could total $26,000. *Id*. at 5.

Plaintiffs agree that the Court has discretion to issue an order as described above. However, they argue that there is only "a little overlap" in the testimony of the three experts, and further that each expert is nevertheless "necessary." In fact, as the above synopsis indicates, the three opinions are largely redundant. No more than one would be necessary. Plaintiffs argue that cutting any single expert would be problematic, because each expert relies upon opinions expressed by the others. Langford "uses the factual conclusions of the two practice area experts ... as the basis of her opinions on whether there were ethical violations." Opp. at 3. However, as shown above, none of experts' "assumptions" rely upon the other experts' testimony.

In their opposition, Plaintiffs also point to another disagreement between the parties. According to Plaintiffs, when County Counsel was acting to hinder the release of documents, it was making these arguments in a "dependency court." Defendants, they argue, reject this proposition:

> Defendants claim that they acted properly in the Juvenile Dependency Court, yet they deny that they were in a Dependency Court (also referred to as Child Welfare Law), claiming, incredibly, that it was a "Juvenile Court" matter that didn't involve a Dependency Proceeding so therefore the rules and duties of Dependency litigation did not apply.

Opposition at 3-4. While it is unclear from this passage why Plaintiffs are raising this dispute,[7] the section header suggests that this dispute matters because "Dependency Court [e]xpert testimony ... [f]orms the [b]asis of the [e]thic's [*sic*] [e]xperts' [o]pinion." *Id*. at 3. In other words, Plaintiffs seem to be arguing that testimony on dependency court practices is relevant and admissible.

However, this is not the issue before the Court. The Court's concern is whether the testimony of *all three* experts should be permitted. Here, all three experts state the same opinions on this matter. All three experts agree that certain heightened standards apply in dependency cases, and that such heightened standards can apply even where (as here) no proceedings were instituted to declare a minor a dependent under Welfare & Institutions Code § 300.[8] These opinions are needlessly redundant.

In reaching this conclusion, the Court need not reach Plaintiffs' arguments as to why testimony on dependency court standards is relevant. Nor is it necessary to reach Defendants' positions for why these standards are entirely inapplicable.[9]

---

[7] It is unclear whether this disagreement even exists. Plaintiffs quote deposition testimony of County Counsel Carol Helding for the purpose of showing that County Counsel "deny that they were in a Dependency Court," but the excerpted material does not actually reflect how anyone from County Counsel would define this term. *See* Helding Depo. at 77. ("[Helding]: If you mean by dependency case a case filed before the juvenile court I only filed two objections or oppositions in that juvenile case ... If you mean by dependency case the case that flows from a W and I Code 300 petition there was never a dependency case." "[Goldstein]: All right. And I'll use your terminology.")

[8] *See* Langford at 28 ("The matter concerning the records requests was heard in the Dependency Department by a Dependency judicial officer, and the records prepared by the social workers were intended to be used in a dependency action (a detention warrant was discussed on two occasions with County Counsel), so Ms. Helding had to take into account the child's interests"); Haralambie at 3 ("The records sought to be disclosed were obtained in furtherance of the investigation of a possible dependency filing. Therefore, the *parens patriae* interest and raison d'etre involved in dependency cases would also apply to a request for those records in a family court custody case ..."); Bryan-Furgurson at ¶14 ("Welfare and Institutions Code Section 827 and California Rules of Court 5.552 give the child's parents the right to obtain documents made available to social workers of child welfare services programs, law enforcement agencies and judicial officers in a dependency that are not otherwise confidential or privileged without a court order. This applies regardless of whether a petition is filed or not.")

**CONCLUSION**

It is clear that the three experts' positions are essentially redundant. Defendants' motion is GRANTED. Plaintiffs may proceed with one of the three proposed attorney experts. Plaintiffs may choose this expert; the other two shall be stricken.

IT IS SO ORDERED.

Dated:   **October 16, 2013**              **/s/ Sandra M. Snyder**
                                           UNITED STATES MAGISTRATE JUDGE

---

[9] Defendants argue that there is no such thing in California as "Dependency Court;" that the ABA standards applicable to dependency courts cited by Haralambie have never been cited by any California court; that any heightened standards for dependency proceedings should not apply prior to the filing of a "dependency" case (i.e., a petition under Welfare & Institutions Code § 300); and that the ABA standards are not applicable by their own terms. (The Court notes that the standards identify the term "dependency" as an example of "Abuse and Neglect Proceedings;" these are in turn defined as "legal proceedings designed to protect maltreated or endangered children that is generally initiated by the government.")