**UNITED STATES DISTRICT COURT**

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAMELA FOX, ON BEHALF OF HERSELF AND AS NEXT FRIEND TO C.M.R., A MINOR,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF TULARE, LETICIA CASTANEDA, ERICA SOTO, RON CASTANEDA, JULIA LANGLEY, CAROL HELDING, JOHN ROZUM, STEVEN ROGERS and DOES 1-100,<br><br>Defendants. | Case No. 1:11-cv-00520-AWI-SMS<br><br>ORDER RE: MOTION TO STRIKE OR LIMIT NON-ATTORNEY EXPERTS<br><br>(Doc. 98) |

Plaintiffs have proposed nine experts. Three of these would offer testimony as to whether Tulare County—in particular, members of the Tulare County Sheriff's Office (TCSO) and Child Welfare Services (CWS)/Child Protective Services (CPS)—responded appropriately to allegations that C.M.R. was being abused. These proposed experts are Loren D. Suter; Brooke P. Lawson; and Robert Geffner.

On August 19, 2013, Defendants Leticia Castaneda, Erica Soto, and Ron Castaneda ("Defendants") filed a motion to strike portions of Plaintiffs' expert witness designations or, in the alternative, to limit the number of attorney experts. Doc. 98. On September 4, 2013, Plaintiffs filed their opposition. Doc. 106. Defendants replied on September 10, 2013. Doc. 112. This Court determined that the motion was suitable for decision without oral argument, and the hearing was taken off calendar and the matter was taken under submission pursuant to Local Rule 230(g).

1

For the reasons that follow, Defendants' motion is GRANTED in part. Because the elimination of any one expert is sufficient to mitigate the problem of duplication, the Court will allow Plaintiffs to proceed with any two experts of their choosing; the third expert will be stricken.

**BACKGROUND**

The three reports rely upon a number of factual assumptions. Without suggesting that any of these allegations are either true or false, the Court begins by summarizing these allegations.[1]

C.M.R. was born in October 2005. Rogers had by this point been "arrested at least six times" for DUI, with three convictions. Soon after C.M.R. was born, Fox and Rogers separated and Fox filed for child support. Her filing detailed a variety of abusive and potentially traumatizing behaviors by Rogers towards her. Geffner at 9-11. In September 2006, psychologist Robert Gandolfo (not, apparently, associated with Tulare County) conducted a child custody evaluation of Rogers and Fox. This report may have contained errors which favored Rogers and disfavored Fox, both in their custody disputes and in the eyes of CWS. Geffner at 6, 18.

On April 25, 2007, Rogers contacted Ron Castaneda, his longtime acquaintance and a Lieutenant with the Sheriff's Office. Rogers told Castaneda that he had noticed redness on C.M.R.'s vaginal area and feared possible abuse by Fox's live-in boyfriend, Edward Skelton. Castaneda ultimately wrote a report documenting this conversation, but there were a number of potentially serious anomalies in his documentation and investigation which suggested favoritism towards Rogers.

On July 22, 2008 (and continuing far into the morning of July 23), Fox made her first report alleging sexual abuse by Rogers against C.M.R. Specifically, she told Sheriff's Deputy Holmes that earlier that day, before Rogers arrived to pick up C.M.R., she had observed C.M.R. exhibiting behaviors which suggested sexual abuse by Rogers. Fox told Holmes that she then made a drawing "from which her daughter identified the shape of her father's penis." Fox also disclosed that she had observed suspicious behaviors in C.M.R. over the past half-year or longer. Lawson at 4, 6. Separately, Deputy Pumarino visited Rogers and C.M.R. According to her report, she heard C.M.R.

---

[1] The facts prior to 2007 are from a portion of the Geffner report. All remaining facts derive from the Lawson report, which contains the only statement of facts among the three reports.

2

make a variety of statements such as that "daddy pee pees in her potty." *Id*. at 4. The next day (July 24, 2008), C.M.R. was brought in for a CART (Child Abuse Response Team) interview. The interview ended when C.M.R. "lost interest and said she needed to go to the bathroom." *Id*. at 6.

As part of this same investigation, on July 23, 2008, Rogers voluntarily turned over his computer hard drive to Sheriff's Detective Terry Titus. Detective Titus prepared an affidavit for a warrant to search the computer for images of child exploitation. On July 29, 2008, Detective John Lee informed a social worker that child pornography had been found on Mr. Rogers's computer. Suter at 3; Lawson at 6. For the next several weeks, CPS deferred to Detective Lee's investigation. On August 14, 2008, Rogers's computer was formally searched for exploitative images. On August 20, these results were recorded in the search warrant inventory by Detective Titus. According to the report, the hard drive contained images "consistent with the definition of sexual exploitation of child [sic]," including some that were "graphic in nature." The report showed that on July 22, 2008—the same day that Fox gave her report to Deputy Holmes—the computer had been used to access sites with names such as "Preteen Models" and "Free Photos of Little Girls."

On September 2, 3, and 4, 2008, Detective Lee continued his investigation of the images found on Rogers's hard drive. He interviewed Rogers, his daughter Kristi, his friend Clyde Tillery, and his mother. Lawson at 8-9. Later that month, the DA declined to prosecute on the images due to issues of credibility and corroboration. Lawson at 10. (Fox, however, recalls calling the DA's office a month later and being told by someone that the decision was because there was no "evidence of child pornography;" this, she believes, is false, and thus is evidence that the prosecutor "never received" the images. Lawson at 10.) Ultimately, on September 29, 2008, Detective Lee indicated that the findings of his child abuse investigation were "inconclusive."

The next month, on October 24, 2008, Fox made a second round of allegations. She gave Detective Lee a home videotape showing C.M.R. engaging in sexualized behavior. It is questioned whether Lee followed up appropriately. Lawson at 10.

On November 12, 2008, Fox reported that C.M.R. had recently made more suggestive statements. This report, Fox's third, was investigated by Sheriff's Deputy E. Holt and by social worker Erica Soto, a defendant in this case. They interviewed several persons. When asked if her

3

mother had explained why the investigators were there, C.M.R. replied, "My mom told me in my room my dad did this." In Lawson's characterization, "Social Worker Soto did not ask any other question of C.M.R. that could have potentially allowed C.M.R. to provide a disclosure." Lawson at 12.

Five days later, on November 19, 2008, a second CART interview was conducted. Detective Kennedy, who witnessed the interview, wrote a brief, and unremarkable, description. He characterized the child molestation investigation as "unfounded." Erica Soto reached the same response in her report for CWS. Lawson, however, believes that Kennedy's summary of the interview omitted a key moment: when asked what she did at her father's house, C.M.R. said, "My dad touched my pee pee." Lawson at 12.

On December 2, 2008, Rogers contacted CWS to complain that Fox was instructing C.M.R. to make allegations against him. A meeting was held between Fox, Rogers, social worker Soto, and her supervisor Leticia Castaneda. According to Fox, Castaneda told her to stop making allegations of child abuse. Lawson at 13.

On February 9, 2009, C.M.R.'s therapist, Lizbeth Lerma, formally reported hearing C.M.R. make statements suggesting abuse by her father. Lerma was never interviewed. Lawson at 13.

On March 1, 2009, a hospital nurse reported similar statements. The allegations were again investigated by Detective Lee. His investigation report also revealed some factors which suggested that there may not have been abuse. Lawson at 13. Lee decided against arranging a (third) formal CART interview, based in part on his belief—which, again, Lawson challenges—that C.M.R. had made no disclosures in the prior CART interviews. Instead, on March 4, 2009, Lee arranged for Rogers to bring C.M.R. for a non-CART interview with himself and social worker Soto. Later he also interviewed the reporting hospital nurse. In a report dated March 16, 2009, he concluded that the allegations were unfounded.

On July 14, 2009, therapist Lerma submitted another mandated report. This time, she was not reporting statements that C.M.R. had made to her; rather, Fox told Lerma about things Fox had heard C.M.R. say. A sheriff's deputy was assigned to investigate the case. Fox explained that she did not report C.M.R.'s latest behaviors herself because she had been warned not to make reports.

4

When the deputy contacted social worker Erica Soto, Soto discouraged his investigation, explaining that the previous allegations had been determined to be unfounded. Ultimately, the deputy closed his report as unfounded. For a second time, there is no evidence that therapist Lerma was contacted.[2]

**The Attorney Expert Reports**

**Suter**

Suter has held a number of executive positions in California government, including (as relevant here) nine years as Deputy Director of Adult and Family Services for the California Department of Social Services, the organization that oversees and investigates the conduct and operations of individual county child welfare services organizations. For his opinion, he relies on the FAC, the County CWS file, certain Department of Social Services regulations, promotion-related materials in Leticia Castaneda's personnel file, and the depositions of Leticia Castaneda, Soto, and Fox. His report focuses on the activities of CWS workers; he does not offer opinions on the behaviors of TCSO employees. He offers the following opinions:

a) "[A]s soon as they were informed that there was sexual abuse allegations against Steven Rogers and images of child pornography were found on his computer," the CPS social workers "should have intervened and protected the child." "[I]t is unbelievable that the county social workers took no action to protect the child." This conclusion is "support[ed]" by certain state statutes, such as Welfare and Institutions Code § 300, which states a policy of protecting children who have been "sexually abused ... by his or her parent." Suter at 3-4.

b) State regulations do not permit social workers to defer child abuse investigations to law enforcement. Not only was this regulation violated by the social workers in this case, but Tulare County apparently admits that it abdicates this responsibility as a general matter. Suter at 4-5.

c), d), d), and f)[3] The social workers failed to be objective. Instead, they "simply decided that the custody dispute was the root of all the abuse allegations." It can be dangerous to not be

---

[2] Geffner's report indicates that there was also a third referral from C.M.R.'s therapist. Geffner at 15. It is not mentioned in Lawson's chronology.

[3] The report contains two consecutive items labeled d).

5

objective when investigating abuse allegations in the context of custody disputes. Suter at 5-6. Quoting from the regulations which guide the decision whether to conduct an in-person investigation, he notes that one of the "factors" to be considered is whether there are "new allegations or risk factors." Such factors materialized "when the county staff were informed that child pornography was found on CMR's father's computer."[4] Because of these new factors, "social workers should have evaluated the referrals independently from prior referrals." Suter at 7.[5]

     e) Leticia Castaneda did not meet state requirements for the supervisor role. Suter at 9-10.

**Lawson**

Lawson is a former police detective with a variety of experiences investigating and educating in the area of child sexual and physical abuse. The list of documents she reviewed (78 in all) includes depositions, court filings, investigative reports, and other discovery material.

She begins with a thorough factual narrative. This contains a variety of criticisms of the steps taken by TCSO employees—particularly Detective Lee—in investigating the various allegations. Her report concludes with a brief opinion: "[L]aw enforcement (as well Child Welfare Services [sic]) failed to meet the reasonable standards of a child sexual molest investigation on the part of C.M.R. and her mother, Ms. Rogers [sic]." She quotes from a TCSO policy, then continues, without clarifying whom she is referring to, "The very entities put in place to conduct preliminary and specialized investigations failed. They did not conduct thorough and proper investigations ..." Lawson at 17. Again, speaking ambiguously of "The authorities," she opines that they "should have also placed a greater emphasis on the fact Mr. Rogers had child pornography on his computer which in its self [sic] violates social norms and should have weighed heavily toward the investigative possibility that he was sexually molesting his daughter." Lawson at 17.

---

[4] In fact, CWS did perform an in-person investigation after Fox made her first allegation of abuse in July 2008. If Suter is referring to subsequent failures to conduct an investigation, then it is possible that Suter's chronology differs from Lawson's. As paraphrased above, it is Lawson's understanding that Detective Lee informed social workers of the existence of child pornography on July 29, 2008. This was early in the investigation into Fox's first set of allegations—only five days after C.M.R.'s first CART interview and two months before Lee closed the sexual abuse investigation as "inconclusive."

[5] Under f), Suter provides this opinion: "[O]n several occasions county staff made the statement that they did not respond because there were already four previous allegations of sexual abuse by the mother. From the documents, the mother only made one allegation of sexual abuse. The others were made by mandated reporters. Obviously, the county social workers did not possess any information regarding the other three referrals." Suter at 10. This diverges from the factual summary provided by Lawson, as paraphrased above, which shows that the mother made three allegations of sexual abuse. All occurred prior to December 2, 2008, when Leticia Castaneda allegedly told her to stop making these allegations.

6

**Geffner**

Geffner is a forensic consultant at a nonprofit connected with Alliant International University. His appendix of documents reviewed contains 482 items.

Geffner's overarching opinion is that the case "reflects numerous examples of system failure." Although the report never defines the term "system," it does clarify that "System failure occurs when child protective systems do not follow appropriate procedures or standards of practice such that a child who is supposed to be protected by these systems is not." He offers examples:

- "Family Court has at times determined that no abuse has occurred because there was no substantiated allegation by CPS, and vice versa ... [leading] to system failure because nobody actually investigates the allegations." Geffner at 2.
- "Ms. Soto and Ms. Castaneda stated in their depositions that they are not allowed to determine the outcome of sexual abuse allegations due to being unable to do forensic interviews. ... [However,] Child Welfare is required to complete its own investigation of any allegation." Geffner at 3.
- "No one contacted the therapist who reported the abuse to determine what caused her to make the mandated report. The social workers, without any proper investigation or verification of the assumptions they made, had apparently concluded that the reports of child abuse were made by what they incorrectly perceived to be an obsessed mother who made false reports against various men." Geffner at 3.
- "Incorrect assumptions and biased perceptions dominated this case rather than the required analysis of the data available." Geffner at 4.
- "They seemed more concerned with trying to discredit Fox ... the over-riding assumption became that Ms. Fox had made 'four false allegations.'" Geffner at 4.
- "This system failure was so apparent in the records that it is hard to believe that nobody who was assigned to this case from these various systems paid attention to so many clues over so many years." Geffner at 3.
- "Ms. Soto[] stated she does not recall speaking with CMR's therapist and did not know why she did not. In her deposition, Ms. Castaneda also indicated that she did not speak with C.M.R.'s therapist. This is a clear violation of proper procedures of investigation." Geffner at 5.
- CWS "should have consulted with a substance abuse/addiction professional once [Rogers's DUI] issues surface" (referring, presumably, to an interview in 2006). Geffner at 6. Substance abuse in a parent may increase risk of abuse. Geffner at 8. Failure to identify red flags in this respect "suggests an intentional bias in the investigators." Geffner at 8.[6]
- CWS social workers should have recognized the importance of Fox's allegations that Rogers had abused her (as stated in her filing for child support). This abuse mattered because it increased the odds that Rogers was abusive towards C.M.R. and because it might have hindered Fox's ability to communicate her belief that C.M.R. was being abused. Geffner at 9-11.
- Attempts by law enforcement to interview C.M.R. were deeply flawed. Geffner at 12-14.
- "It appears that CWS decided early on that the case with Ms. Fox and Mr. Rogers was due to custody and not actually abuse. ... This continued throughout the case." Geffner at 15.
- "Ms. Soto and Ms. Castaneda automatically assumed Ms. Fox had made false allegations against Mr. Estrada and they had then also decided she had then made numerous false allegations against Mr. Rogers." Geffner at 16.

---

[6] Here, some fault is attributed to the interviewing psychologist, Dr. Gandolfo, but it is not clear that he is employed by Defendants. *See also* Geffner at 18 (critiquing Dr. Gandolfo's child custody evaluation.

7

Geffner's report also cites to a variety of research studies. While the Court cannot summarize every aspect of Geffner's report here, the general observation is that the above-mentioned excerpts are representative of the report's opinions, particularly their strong resemblance to the opinions in Suter's report.

**DISCUSSION**

Defendants' motion raises only a single issue. The Court takes no position on whether the experts' reports are scientific, or relevant, or otherwise inadmissible. Instead, the issue is simply whether the reports are needlessly duplicative. Defendants ask the Court to limit the use of testimony from these three witnesses to "avoid unnecessary proof and cumulative evidence." Referring to an analogous motion filed by the Tulare County Defendants (Doc. 96), Defendants complain that "the opinions expressed by plaintiffs' retained expert on child welfare services are duplicative and cumulative and will create unnecessary expense to defendants at this stage of the litigation for purposes of depositions." Doc. 98 at 1. "Essentially each of these three experts are giving the same opinion, three times." *Id*. at 3.  To depose all three experts, Defendants' costs and fees could total $50,000; to depose only a single expert, their savings might be as high as $32,000. Dillahunty Decl. at ¶8.

The Federal Rules of Civil Procedure acknowledge the court's authority to alter the limits or manner of conducting discovery. "District judges have broad discretion and a range of tools that allow them to control the extent and timing of discovery." *In re GlenFed, Inc. Securities Litigation,* 42 F.3d 1541, 1557 (9th Cir.1994), *superseded by statute on other grounds; Williams v. Monarch Machine Tool Co., Inc.,* 26 F.3d 228, 230 (1st Cir.1994) (acknowledging "the broad discretion of trial judges to manage scheduling, discovery and sanctions"); *Talbert v. City of Chicago,* 236 F.R.D. 415, 419 (N.D.Ill.2006) (noting that judges "have vast discretion in supervising discovery"); *see also Green Const. Co. v. Kansas Power & Light Co.*, 1 F.3d 1005, 1014 (10th Cir. 1993) ("It is certainly within the district court's discretion to limit the number of experts, provided the witnesses are not excluded arbitrarily, or on the basis of mere numbers."). For example, the Court, on its own initiative, may enter appropriate orders limiting the extent of discovery if it determines that the "discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other

source that is more convenient, less burdensome, or less expensive." *See* Fed.R.Civ.P. 26(b)(2)(C)(i). Rule 16, discussing pretrial conferences, gives the Court broad authority towards "avoiding unnecessary proof and cumulative evidence." These rules, like all the Federal Rules of Civil Procedure, must be "construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding." *See* Fed.R.Civ.P. 1.

Plaintiffs argue that while there is "a little overlap" in the testimony of the three experts, each expert is nevertheless "necessary." For example, Lawson (the former detective) is the only expert to opine on the impropriety of Ronald Castaneda's handling of Rogers's phone call, while another expert (presumably Geffner) provides "commentary on the bias and discriminatory practices, policies and procedures" of the TCSO and CWS employees, including bias "against women in child custody matters where child abuse is alleged." Doc. 106 at 2-3.[7]

The Court concludes, first, that the opinion of Lawson is not significantly duplicative of the other opinions. Aside from the incidental references to CWS at the end of the report, Lawson's report consists essentially of opinions regarding the investigatory practices of TCSO officers. These opinions are unique to Lawson's report. This report is not duplicative of the others.

The reports of Suter and Geffner are another story. Geffner's report rarely departs from a handful of themes which are equivalently discussed in Suter's report (and to a lesser degree in Lawson's): CWS did not evaluate evidence because it relied on prejudgment; CWS was wrong to not investigate an allegation of child abuse independently from law enforcement; CWS should have contacted the therapist (Lawson holds the same opinion as to TSCO); attempts by law enforcement to interview C.M.R. were deeply flawed (Lawson holds the same opinion.) Geffner's report does offer some unique opinions—particularly, assesses the effects of Rogers's alleged abusive behaviors towards Fox (Geffner at 9-11) and it criticizes the 2006 custody-related psychological assessment of Rogers. However, it does not logically connect these opinions to any conclusion of malfeasance by Defendants. Otherwise, aside from the inclusion of scholarly sources (not always

---

[7] In fact, none of these experts opines as to the existence of gender bias. Geffner, in particular, does refer frequently to "bias," but there is no reason to believe that he is referring to gender bias. The section of his report relating to gender bias consists entirely of citations to statistics and studies without mentioning the parties in this case at all. Geffner at 20.

9

relevant, *see supra* note 7) and the term "system failure," the opinions in this report can generally be found in either Suter's or Lawson's reports.

While some pairs of reports are more duplicative than others, the elimination of any one expert is sufficient to mitigate the problem of duplication. Therefore, the Court will allow Plaintiffs to proceed with any two experts of their choosing; the third expert will be stricken.

## CONCLUSION

Defendants' motion is GRANTED in part. Plaintiffs may proceed with any two experts of their choosing; the third expert will be stricken.

IT IS SO ORDERED.

Dated: __October 16, 2013__                    __/s/ Sandra M. Snyder__
                                                                    UNITED STATES MAGISTRATE JUDGE