# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAMELA FOX, ON BEHALF OF HERSELF AND AS NEXT FRIEND TO C.M.R., A MINOR,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF TULARE, LETICIA CASTANEDA, ERICA SOTO, RON CASTANEDA, JULIA LANGLEY, CAROL HELDING, JOHN ROZUM, STEVEN ROGERS and DOES 1-100,<br><br>Defendants. | Case No. 1:11-cv-00520-AWI-SMS<br><br>ORDER DENYING PLAINTIFFS' MOTION TO FILE A SECOND AMENDED COMPLAINT<br><br>(Doc. 123) |

On October 7, 2013, Plaintiffs filed a motion requesting leave to file a Second Amended Complaint (SAC). Doc. 123. Oppositions were filed November 6, 2013. Doc. 136; Doc. 138. On November 13, Plaintiffs replied. Doc. 142. For the reasons that follow, Plaintiffs' motion is denied.

### PROPOSED AMENDMENTS

The SAC would add a new defendant, Detective John Lee of the Tulare County Sheriff's Office (TCSO), in his individual capacity. Doc. 125 at ¶33. He would be named in claims one and three, alleging violations of 42 U.S.C. §§ 1983 and 1985. The SAC also appears to name Detective Lee in the sixth claim, for intentional infliction of emotional distress, but in their reply Plaintiffs acknowledge that this was in error. Doc. 142 at 3. The new factual allegations are as follows:

- Family Court mediator Lourdes Dawson submitted a report in which she said she was told that Defendant Rogers had no computer in her home. Doc. 125 at ¶150.
- In her notes, Ms. Dawson attributed this statement to Detective Lee. Her notes also record statements by Detective Lee that the mother had a history of making allegations against others; that Lee interviewed the child and there was no evidence of abuse; and that the mother took the child to medical examinations. *Id.* at ¶¶151-52.
- In July and August of 2009, Plaintiff Fox filed petitions in the Juvenile Court to secure the records of the CWS investigations and those of the Tulare County Sheriff's investigations. *Id.* at ¶174.
- On July 16, 2013, Detective Lee testified at his deposition that in 2010, he had signed an authorization for destruction of evidence in the July 2008 investigation into child pornography on Defendant Rogers's computer. Recordings of interviews with CMR were retained, but recordings of interviews with Defendant Rogers have disappeared. *Id.* at ¶198-99.

## ALLEGED GROUNDS FOR AMENDMENT

Plaintiffs argue that it is appropriate to add Detective Lee as a defendant because there is new evidence which clarifies his "complicity in the coverup" and which "reveal[s] a serious lack of credibility" showing "that he was in this matter much deeper" than previously suspected. Motion at 6. Plaintiffs identify three sources of new evidence. First, in May 2013 Plaintiffs obtained additional copies of explicit images from Rogers's computer. Second, in July 2013 Plaintiffs conducted depositions, including of Detective Lee. Third, in August 2013 they obtained reports from expert witnesses who opined on the computer images and on Detective Lee's actions. From these sources, Plaintiffs state that they have learned the following new details regarding Detective Lee's role in this case.

**1. Comments to Social Workers.**

As the parties have long known, shortly after midnight on July 22/23, 2008 (hours after Fox first told law enforcement that Rogers was molesting their daughter), two TCSO deputies were dispatched to interview CMR. According to Deputy Pumarino's report, CMR stated that "her 'daddy' 'peppes [sic] in her potty.'" She also said "her 'daddy' 'popped her peppe' and she has 'kissed her daddy's peppe on her bed.'" Exhibit 4 filed under seal. Nevertheless, in notes dated July 29, 2008, social workers wrote that Detective Lee "stated that the child did not disclose any sexual abuse and talked about how much she loves her father." Exhibit 3 filed under seal.

Asked about this statement at his deposition, Detective Lee stated that he was referring to the child's CART (Child Abuse Response Team) interview. Goldstein responded that this interview

2

had not happened yet, but Detective Lee insisted it had. (Detective Lee was correct; he had witnessed the interview. *See* Doc. 98-3 (declaration of Plaintiffs' proposed expert witness, Brooke Lawson) at 6-7.) Goldstein then asked whether Detective Lee's comments to the social workers were not "really" correct. Detective Lee responded that when he made these comments, he was aware of the July 23 Pumarino interview; he only would have made such comments if they were regarding "the CART interview, any interview I would have done with the victim," adding that "I can't speak for their note taking or their comments." 118:23-119:12.

### 2. Sealing of Search Warrant.

As the parties have long known, on July 23, 2008, Defendant Rogers voluntarily gave his hard drive to TCSO Detective Terry Titus. That same day, Detective Titus obtained a warrant permitting the hard drive to be searched for "photographs of prepubescent and adolescent children depicted in a sexually explicit manner." Ex. D. to Woods Dec. (doc. 136-2). As part of his request for a search warrant, Detective Titus had specifically requested that the warrant, affidavit, return, etc. be sealed to protect the victim's confidentiality. In the request, he wrote:

> This case involved an allegation of sexual, physical or other abuse involving a minor or other person protected by California Penal Code 293 and under this section the victim or victim's parent, guardian or other responsible person has requested that his/her name be kept confidential from public view.
>
> Disclosure of the Search Warrant itself, the return, the Affidavit or any attachments thereto to the general public, would violate the victim's lawful right to confidentiality [And could frustrate the further investigation and prosecution of this case.]
>
> Ex. D to Woods Decl. (brackets in original)

In their motion to amend, Plaintiffs state that until Detective Titus had been deposed, "it was not known why" Titus had made this request. Motion at 6. Detective Titus testified that he did so because Detective Lee "told me that it needed to be sealed because it was a search warrant on a possible child sexual assault case." Titus Depo. at 39:1-4. Asked whether this reflected any Sheriff's Office policy, Detective Titus said he did not know. *Id*. at 39:5-14.

### 3. Failure to Submit CD to Prosecutors

As the parties have long known, the search of Rogers's hard drive was executed by Detective CJ Porter. Detective Porter's written report is dated August 14, 2008. Ex. E. to Woods

Dec (Supplemental Report for TCSO case number 08-10615). In his report, Detective Porter said he "performed a search of all digital image formats" on the hard drive and that he found "the image [sic] consistent with the definition of sexual exploitation of child." *Id*. This report contains images. It is Plaintiffs' position that the images in this report constitute child pornography. Reply at 4, citing Rinek Declaration (doc. 123-4).[1]

Detective Porter later explained at his deposition that he omitted images which he deemed to be "too graphic;" this was a precaution that he took in case "the file got out." Porter Depo. (doc. 142-1) at 33-34 (the report contained "just head shots or stuff like that," or "banner ads from websites, which are borderline"). His written report does, however, note the existence of additional photos. It states: "I have included images in this printed report ... but images that were graphic in nature are on the included report compact disc." Ex. E. At his deposition, Detective Porter clarified that this CD, which he made concurrently with his written report, contained more-graphic photos that he had omitted from his written report. Porter Depo. at 33-34.

On August 20, 2008, Detective Titus prepared a search warrant inventory, relying apparently on Porter's written report. Ex. D. According to Titus's inventory, Porter searched the computer and found "260 Images of prepubescent children depicted in a sexually explicit manner." *Id*. Although the Court does not possess Detective Porter's entire 78-page written report, it seems likely that Detective Titus was referring to the number of images in this report.

At his deposition, Detective Lee stated that he received Detective Porter's CD, as well as Porter's "full report with every attachment of every single image he pulled off." Lee Depo. (doc. 142-1) at 87-89. He did not recall whether the District Attorney "would have gotten" the CD, but he did believe that "[t]hey would have had Porter's report and every single image that ... Detective Porter pulled off the computer." *Id*. When asked if he knew that other sexually explicit images were later found on the computer, he said he did not. *Id*. Lee's testimony, while ambiguous, raises the

---

[1] The opinion of Plaintiffs' expert, Jeffrey Rinek, is less clear. Rinek, a private investigator and former Special Agent with the FBI, opined in July 2013 that "the offender downloaded and possesses child pornography." *Id*. at ¶39. He also opined that the matter "should have been referred for prosecution to state, and federal authorities." *Id*. at ¶42; *see id*. at ¶¶26, 34, 43 (basing this opinion on Detective Porter's written report and CD and "additional files located on the hard drive.").

4

possibility that he acted on the mistaken belief that all the photos on the CD were also in the written report.

In her deposition taken May 23, 2013, Plaintiff Fox stated that on October 22, 2008, she spoke with someone at the District Attorney's Office who told her that their report contained no mention of child pornography. In the July/August 2013 opinion of Plaintiffs' proposed expert Brooke Lawson, this person's statement "indicated DDA Esbenshade never received a copy of the CD-rom which contained the evidence of child pornography." Doc. 98-3 at 11. Fox apparently understood this herself: in October 2008 she called Detective Lee and accused him of failing to turn over the entire file to the District Attorney. Ex. B to Woods Decl., 51:15-52:25, 53:7-54:13.

In July 2009, Plaintiffs first filed a petition, unopposed by CWS or the County, to obtain CWS files. Woods Dec. at ¶11. They received Titus's inventory on October 20, 2009. Ex. H. to Woods. Decl. at 43-44. Attorney Christenson said that when he saw it, he was "surprised" and formed the opinion that "things had been misrepresented to [him]" up until that point. *Id*. In May 2010, Plaintiffs obtained Detective Porter's written report. Ex. B., pp. 86:13-17. Later, on December 13, 2010, Plaintiffs obtained a copy of Rogers's actual hard drive.

Goldstein states that he has "repeatedly" and "continually" asked for the compact disc mentioned in Detective Porter's report. Goldstein Dec. #2 (doc. 142-2) at ¶4; Reply at 5:15. This declaration identifies only one example: In February 21, 2013, Plaintiffs served their Request to Produce Set Four, number two. Goldstein declares that this RTP "asked ... for that disk." Goldstein Dec. #2 at ¶5. In fact, the RTP literally requested "any and all ... electronic media ... provided by the [TCSO] to the Tulare Office of County Counsel containing images copied from the computer belonging to Steven Rogers." Reply at 5:17-20.

In the meantime, Goldstein had possessed Rogers's hard drive since December 2010. Plaintiffs' expert Scott Janssen was not "able" to examine the "entire content" of this hard drive until March 2013. Goldstein Dec. #1 (doc. 123-6) at ¶8. Goldstein offers his hearsay understanding of Janssen's expected testimony: while only 260 images had been "reported to have been found by the Sheriff's Department," the computer contained "an additional approximate[ly] 1,500 images

5

containing explicit material involving sex with children and adults who were made out to look like children engaged in sexually explicit conduct." *Id.* at ¶9.

On April 15, 2013, Defendant County of Tulare responded to Plaintiffs' February 21, 2013 RTP. Defendant possessed at least 18 disks responsive to this request and said it would copy and provide these. Ex. 3 to Reply (doc. 142-1 at 10). These were produced on May 23, 2013. Plaintiffs' Reply at 6:2; Goldstein Decl. #1 at ¶10. According to Plaintiffs, until they saw the images on this CD, "Detective Lee's complicity in the cover up of the evidence was not clear." Motion at 6.

### 4. Comment to Mediator About Rogers's Computer.

On April 10, 2009, Lourdes Dawson, the family court mediator, recorded notes of a conversation with Detective Lee. According to these notes, "Detective said he interviewed father and saw no computer in father's home." Exhibit 2 filed under seal. She then wrote a report dated April 17, 2009 in which she stated that Detective Lee told her that "the father does not have a computer in his home."

In her May 23, 2013 deposition, Plaintiff Fox characterize Detective Lee's statement in the April 17 report as a "lie." Ex. B to Woods Decl. at 369:7. Attorney Goldstein asked Detective Lee about this statement—specifically, if it was a statement he "might have made." Detective Lee replied that "If it was a statement I made, it would have been a mischaracterization because I believe we had father's computer at the time." 97:6-11. (Plaintiffs incorrectly state that "Detective Lee denied making that statement." Motion at 4.)

### 5. Incomplete Investigation of Ramon Estrada.

Lourdes Dawson's April 17, 2009 report to the family law court mentioned that Fox had made prior molestation allegations against other individuals. Her April 10, 2009 notes attribute this statement to Detective Lee. The parties have long understood that the boyfriend in question was Ramon Estrada.

During his deposition, Detective Lee testified that during the course of his investigation, he learned about Estrada from Defendant Rogers, who told him that Fox made allegations of child molestation against Estrada as well. 27:1-15. Detective Lee followed up by interviewing Estrada.

6

Estrada said that he and Fox had been going through a custody battle, that Fox began spreading allegations that he was molesting their son, and that he confronted her and she stopped. 29:2-6.

Questioned by Goldstein, Detective Lee acknowledged that he did not attempt to verify Estrada's statements by asking follow-up questions (25:7-26:8), informally checking Estrada's criminal record (29:7-25), or checking with the court for records of Estrada's custody fight (26:11-18). (As Plaintiffs have known since October 2009, a check of Estrada's criminal record would have revealed a 1998 misdemeanor conviction for vandalism. Ex. S. to Woods Decl.) Although Detective Lee insisted that, in his view, "[t]heir custody dispute had nothing to do with this case," (26:14-18) he also acknowledged that a pattern of false allegations by Fox would be material to his investigation (35:9-14, 36:5-10). He did not, however, agree with Goldstein's characterization that it was his purpose to "tag your client with making any false allegations." 30:15-16.

**6. Incomplete Investigation of the Rogers/Fox Marriage.**

During the deposition, Goldstein asked Detective John Lee: "During the course of the investigations that you conducted in 2008, 2009, did you ever read pleadings or court orders that were issued in the family law case that was connected to those investigations?" Detective Lee answered that he did not. 19:13-17. However, he could not rule out whether he did anything else to verify things that were going on at the family court, such as by calling the court. 19:18-23.

**7. Destruction of Evidence.**

Goldstein asked Detective Lee how long the TCSO usually keeps evidence in a criminal case. Detective Lee stated that evidence will be "returned or destroyed" "a year or two" after the case has reached a disposition (such as being rejected). 73:14-17. Goldstein also asked whether Lee ever authorized destruction of any of the evidence from "the investigations you conducted ... in 2008 and 2009." Detective Lee stated, "I know I was given a disposition." This happened "sometime in 2010" but he could not remember the date. At this point, he said, evidence would have been returned to owners or destroyed. 74:4-15. (Plaintiffs oversimplify this testimony, stating that Detective Lee "testified that he authorized the destruction of evidence." Motion at 5.)

**PROCEDURAL HISTORY**

Although Plaintiffs initiated this federal lawsuit in March 2011, Plaintiffs obtained a significant amount of relevant discovery from prior litigation in the California courts. The underlying family court case between Fox and Rogers was first filed in Tulare County in November 2005. Fox was represented solely by family law attorney James Christenson. In May 2009, the Family Court held a hearing at which it relied in part on the report of mediator Lourdes Dawson in issuing a custody order adverse to Plaintiffs. In July 2009, Fox retained Seth Goldstein to represent her in the state court custody matter. Fox then filed her own motion to change custody, while at the same time seeking production of supportive documents from the County.

Plaintiffs filed the complaint in federal court on March 24, 2011. Doc. 1. They filed a First Amended Complaint eleven months later, on November 15, 2011. From the FAC, it is apparent that Plaintiffs possessed and were familiar with much of the evidence which they rely upon in the present motion. This includes, but is not limited to, Detective Titus's search inventory (FAC at ¶105); the contents of the hard drive and the fact that this contained "more child porn ... than what was discovered by sheriff's detectives" (*id.* at ¶191); Ms. Dawson's reports and handwritten notes (*id*. at ¶¶147-50); and reports from social workers containing "untrue" statements about Ms. Fox's allegations attributed to Detective Lee (*id*. at ¶¶145). The FAC acknowledges that "other professionals involved in the case, including the sheriff's investigators," did not credit the child abuse reports beginning in July 2008, but it explains that these persons were "misdirected" by the named defendants who were "[c]onfederates" of Defendant Rogers. *Id*. at ¶39.

On January 12, 2012, the Court issued its Scheduling Conference Order. Doc. 52. This included a deadline of January 11, 2013 for non-expert discovery. On January 7, 2013—one year later and on the eve of their discovery deadline—Plaintiffs moved for an extension of time. Doc. 56. Their request referred to a delay of roughly two months due to an "apparent misunderstanding" of "an agreement that Defendants would timely obtain and then share documents they secured from the Superior Court." Plaintiffs characterized these documents as "essential to have before any discovery was initiated on Plaintiffs part." *Id*.

8

A fifty-minute discovery conference was held on January 15, 2013. Doc. 68. The minute order stated, "Counsel for plaintiff admonished to wait no longer, based on perceived agreements of all counsel to obtain critical discovery documents from County departments, to commence discovery." Doc. 68. Although the conference occurred off the record, the Court recalls expressing that Plaintiffs already had a significant amount of discovery and that some depositions, including those of certain Defendants, could proceed pending further discovery. According to the written orders, the Court noted Plaintiffs' representation that additional counsel would be entering the case and adopted an amended scheduling order including deadlines of July 26, 2013 for non-expert discovery and October 7, 2013 for non-dispositive motions. Docs. 68, 69. The Court emphasized that there would be "<u>no further amendments to the scheduling order absent a showing to the District Court of exceptional good cause</u>." Doc. 69 (emphasis in original).

On June 6, 2013, Goldstein requested an additional scheduling conference. Doc. 75. He indicated that he was still missing parts of various court files. In a synopsis later emailed to the Court, he wrote, "I cannot conduct meaningful depositions of defendants and other governmental witnesses Defendants have identified ... without an assurance that we have everything that the Defendants have available to them in the form of official records." Defendant Tulare County, in its own synopsis, rejected this claim, stating that "[a]ny claims that any depositions have been pre[v]ented by a failure of COUNTY to produce documents is disingenuous at best." A forty-minute discovery conference was held on June 18, 2013. The Court amended deadlines for expert discovery. Doc. 78. Once again, the Court recalls agreeing with Defendants' position and admonishing Plaintiffs for dragging their feet in scheduling depositions.

In a marathon session, Goldstein conducted fifteen depositions between July 8 and July 19. Goldstein Dec. #1 at ¶¶5-6, 11, 16. He obtained transcripts on August 23, September 9, and September 12. *Id.* at ¶12. Expert reports were obtained by August 2. *Id.* at ¶¶13, 15.

Plaintiffs filed the present motion to amend on October 7, 2013, on the last possible day. Goldstein states that this was the first opportunity he had had to file his motion, due to the "press of business." Goldstein Dec. #1 at ¶7. Later, in their reply brief, Plaintiffs qualify this phrase "press of business" as follows: "[F]rom the close of the deposition of Detectives Porter and Lee in July,

9

2013, to the filing of this Motion, Plaintiffs moved as swiftly as possible." Plaintiffs' Reply brief (Doc. 142) at 3.

Goldstein states that he is a sole practitioner; although Andrea Miller has been his co-counsel, he has "conducted all of the functions in this case." Goldstein Dec. #1 at ¶¶2-3. (Ms. Miller "has not prepared any pleadings, discovery nor participated in any depositions." *Id.* at ¶3.) Attorney Maureen Bryant-Furgurson, one of Plaintiffs' experts in this case, also appeared on behalf of Plaintiffs at the September 7, 2011, hearing on the Motion to Dismiss. Doc. 33.

## LEGAL STANDARD

Rule 15(a)(2) of the Federal Rules of Civil Procedure allows amendment of pleadings with leave of court "when justice so requires." Although courts should freely give leave when justice requires, a variety of reasons may be sufficient to deny leave to amend. *See Foman v. Davis*, 371 U.S. 178, 182 (1962). The *Foman* factors commonly considered are: 1) bad faith; 2) undue delay; 3) prejudice to the opposing party; and 4) futility of amendment. *Id*. Amendments seeking to add claims are granted more freely than amendments seeking to add new parties. *Union Pac. R. v. Nev. Power Co.,* 950 F.2d 1429, 1432 (9th Cir. 1991).[2]

## DISCUSSION

### Futility of Amendment

If a proposed amendment is legally insufficient it would be futile to grant leave to amend. *Saul v. United States,* 928 F.2d 829, 843 (9th Cir. 1991). Plaintiffs' proposed amendments fail to state a claim.

Plaintiffs' motion describes a scenario in which Detective Lee concealed evidence that Defendant Rogers possessed child pornography. He lied to social workers, telling them that "the child did not disclose any sexual abuse." He (legally but pretextually) sealed the search warrant which acknowledged sexually explicit photos on Rogers's computer. He withheld from prosecutors the CD containing the most damning evidence against Rogers. And he passed along flimsy

---

[2] Plaintiffs claim they must show "extraordinary circumstances," a standard which turns primarily upon "the diligence of the party seeking the amendment." Reply (doc. 142) at 3, *citing Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992). As in *Johnson*, the scheduling order in the present case does mention a requirement of "exceptional good cause." Doc. 68. However, in this case the language applies only to "further amendments to the scheduling order," which are not at issue here.

allegations to the mediator in Fox's family court case, including the lie that he saw no computer in Rogers's home (implying that there was no basis to believe that Rogers possessed child pornography); the credulous statement that Fox accused her prior boyfriend of child molestation during a custody dispute; and the false impression that he was familiar with Rogers's own ongoing family law case with Fox. Furthermore, while Detective Lee testified that the destruction of evidence in this child pornography investigation was done in accordance with policy, this claim is belied by the fact that some evidence was not destroyed.

However, the SAC fails to make these accusations directly. Simply put, the SAC lacks any "statement of the claim showing that the pleader is entitled to relief" from Detective Lee. FRCP 8. Rather than stating that Detective Lee lied, the SAC mentions only the notes and report of mediator Dawson. The SAC acknowledges an inconsistency in the destruction of documents but it does not suggest its significance. Nor does the SAC make any mention at all of the most prominent allegation in Plaintiffs' motion, the allegation that Detective Lee deliberately withheld Detective Porter's CD report from the prosecutor. Plaintiffs could have pled this fact in the alternative, leaving to another day the decision whether to embrace this fact (which tends to exonerate the CWS and County Counsel defendants). *See PAE Gov't Servs., Inc. v. MPRI, Inc.*, 514 F.3d 856, 859 (9th Cir. 2007). Instead, Plaintiffs did not plead the fact at all.

Even if Dawson's writings were attributed to Detective Lee and all these facts were taken as true, the claims against Detective Lee are primarily allegations of negligence on the part of a government employee in carrying out his official duties. Negligence is insufficient to sustain Section 1983 liability. *See Daniels v. Williams*, 474 U.S. 327, 333, 106 S.Ct. 662 (1986). For individual liability a plaintiff must show that the defendant acted intentionally or recklessly to infringe rights protected by the constitution. *Blaylock v. Schwinden*, 862 F.2d 1352, 1354 (9th Cir. 1998).

Nor have Plaintiffs alleged any actions by Detective Lee which a reasonable officer would have believed, under the circumstances, violated the Plaintiffs' constitutional rights. Law enforcement officers are qualifiedly immune from liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would

11

1  have known." *Harlow v. Fitzgerald*, 457 U.S. 800 (1982). Qualified immunity protects "all but the
2  plainly incompetent or those who knowingly violate the law." *Malley v Briggs,* 475 U.S. 335, 341
3  (1986).

**Undue Delay**

Undue delay is a valid grounds for denying leave to amend. *Texaco, Inc. v. Ponsoldt*, 939 F.2d 794, 798 (9th Cir. 1991). Here, nothing in recent discovery provides a new basis for naming Detective Lee as a defendant:

1. Plaintiffs claim that Detective Lee lied to social workers. But any evidence of this is in the social workers' notes regarding their conversations with Detective Lee. These are not news. At his deposition Detective Lee said nothing inculpatory, and in fact corrected Attorney Goldstein's mistaken chronology of events.

2. As for the sealing of the search warrant, nothing new can be inferred from the fact that it was Detective Lee and not Detective Titus who made the decision to do so. Detective Lee's stated reasons for doing so were entirely consistent with those on the face of the request to seal.

3. The same is true of Detective Lee's connection with the investigation of Rogers' computer in 2008. Plaintiffs were told in October 2008 that no criminal charges would be filed against Rogers. On October 22, 2008, Plaintiff Fox spoke with someone at the District Attorney's Office who told her that their report contained no mention of child pornography. It is Plaintiffs' suggestion that they needed to wait until August 2013 to learn from their expert, Brooke Lawson, that this statement indicated that the prosecutor did not receive evidence of child pornography. This is false. Fox testified at her deposition in May 2013 that she herself formed the belief that Detective Lee had failed to turn over the entire file to the district attorney; she called him then and told him so.

Plaintiffs claim that "Detective Lee's complicity in the cover up of the evidence was not clear" until May 2013, when they saw the images on Detective Porter's CD. Yet they reached the same conclusion in October 2009, when Ms. Fox's family law attorney, Mr. Christenson, obtained Titus's search warrant inventory and was "surprised" and concluded that "things had been misrepresented to [him]" up until that point. *Id*. In any event, Plaintiffs knew or should have known

about the existence and nature of Detective Porter's CD since May 2010, when they obtained his written report mentioning and describing the CD.

4. Detective Lee shared nothing new about his statement to mediator Lourdes Dawson regarding Rogers's computer. He only stated that "if" he told her Rogers had no computer, that would have been a "mischaracterization"—an extremely noncommittal statement.

5. While it was not previously known how Detective Lee determined that Fox had made allegations against Estrada, the revelation that his primary source for this determination was the say-so of Estrada himself is not surprising, nor is it grounds for liability.

6. As for Detective Lee's other investigative work, he said nothing to rule out the possibility that he did investigate details of the family law case between Rogers and Fox.

7. Detective Lee's statements regarding the destruction of evidence were also noncommittal. He did not take any responsibility, and simply described what would have happened.

In short, the "new evidence" adduced by Plaintiffs is a red herring. Any significant information relating to Detective Lee was known to Plaintiffs long before then. Four years ago, Plaintiff Fox believed that Detective Lee intentionally withheld evidence. Since May 2010, Plaintiffs knew there existed a compact disc containing additional files from Rogers's computer. Although Goldstein declares that he "repeatedly" and "continually" asked for this compact disc, he only identifies a Request to Produce dated February 21, 2013.

Even if this recent discovery did constitute material new facts, there is no excuse for Plaintiff's extended foot-dragging in obtaining it. Here the Court is not referring merely to the three-month period prior to the filing of this motion, during which, according to Plaintiffs, they "moved as swiftly as possible." The docket reflects that roughly eighteen months elapsed between the date of the Court's first scheduling order and the occurrence of the first depositions in the case. Plaintiffs have explained that they delayed conducting depositions until they resolved their suspicions regarding missing discovery. This delay was unwarranted. Had Plaintiffs initiated depositions when they were able to, and made their allegations regarding Detective Lee's role as early as they could have, they could have avoided inflicting upon the Defendants a great deal of delay and prejudice, both past and anticipated. The Court specifically recalls expressing these

13

opinions to Plaintiffs during the off-the-record conferences in this case. Yet even without these admonishments, these conclusions should have been self-evident.

Goldstein states he is a "sole practitioner." But the Court adopted an amended scheduling order in part with the understanding that additional counsel would be entering the case. Doc. 68. The Court imputes to Plaintiffs the assistance of co-counsel whose name appears on their filings.

**Prejudice to Defendants**

Prejudice to the opposing party carries the greatest weight in determining leave to amend under Fed. R. Civ. P. Rule 15. A need to reopen discovery and therefore delay proceedings alone supports a finding of prejudice sufficient for denial of a motion to amend. See *Lockheed Martin Corp. v. Network Solutions, Inc.,* 194 F.3d 980, 986 (9th Cir. 1999). Here, the Defendants will be prejudiced by amendment because it will require the re-opening of discovery and the naming of experts qualified to give opinions on the sufficiency of criminal investigations by law enforcement officers.

## CONCLUSION

Plaintiffs' motion to file a Second Amended Complaint (doc. 123) is DENIED.

IT IS SO ORDERED.

Dated: **December 19, 2013**               **/s/ Sandra M. Snyder**
                                                                    UNITED STATES MAGISTRATE JUDGE

14